IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


WILLIAM D. DUNAWAY,                                    CV 06-550 ST

                        Plaintiff,                              FINDINGS AND
                                                               RECOMMENDATION

              v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                        Defendant.
_____

STEWART, Magistrate Judge:

## <u>INTRODUCTION</u>

        Plaintiff, William Dunaway ("Dunaway"), brings this action pursuant to the Social

Security Act, 42 USC § 405(g), to obtain judicial review of a final decision of the Commissioner

of the Social Security Administration ("Commissioner") denying his claim for Disability

Insurance Benefits.  For the reasons set forth below, the decision of the Commissioner should be

affirmed.

///

# PROCEDURAL BACKGROUND

Dunaway filed an application for benefits on September 8, 1999, alleging disability since March 1, 1998, due to a pinched nerve in the neck, arthritis in the hands, knees, and possibly neck, stomach problems and knee surgeries. Dunaway's date last insured for Title II disability insurance benefits was December 31, 2003. His application was denied initially and upon reconsideration. On September 17, 2001, a hearing was held before an Administrative Law Judge ("ALJ"). In a decision dated September 28, 2001, the ALJ found Dunaway was not entitled to benefits. On January 17, 2003, the Appeals Council denied Dunaway's request for review.

Dunaway filed a complaint, Civil Case No. 03-331, in this court. The Commissioner conceded legal error and sought remand for further administrative proceedings. On November 30, 2004, the court remanded the case for further administrative proceedings. Dunaway submitted new medical and documentary evidence. On August 26, 2005, a hearing on remand was held before an ALJ. In a decision dated January 6, 2006, the ALJ found Dunaway was not entitled to benefits. Dunaway filed this action on April 25, 2006.[1]

///

///

---

[1] Only final decisions of the Commissioner may be appealed to a federal district court. 42 USC § 405(g). Federal statutes and regulations set forth an administrative appeals process, as well as deadlines for filing requests for review and federal court actions. The ALJ issued the decision after remand on January 6, 2006, and Dunaway filed this action on April 25, 2006, more than 60 days later. The regulatory provisions cited by the parties contemplate either review of the ALJ's decision by the Appeals Council (20 CFR § 404.981) or an expedited appeals process for reconsidered determinations, waiving further administrative review upon written agreement (20 CFR § 422.210(a)), neither of which is reflected in the record. Nevertheless, in their pleadings and their briefing, both parties agree that the ALJ's January 6, 2006 decision on remand is a final decision of the Commissioner subject to judicial review. Complaint (docket #2), ¶ 4; Answer (docket #8), ¶ II (admitting ¶ 4 of Plaintiff's Complaint); Plaintiff's Opening Brief (docket #30), p. 2; Defendant's Brief (docket #31), p. 4. Thus, this court assumes for reasons that are not clear in the record, that Dunaway has exhausted his administrative remedies and met all relevant deadlines for filing his federal court appeal.

## FACTUAL BACKGROUND

Born in 1958, Dunaway was 39 years old on his alleged onset of disability date. He has a general education diploma, attended some college, and has had some computer training. Dunaway worked as a welder in the United States Navy from 1976 to 1997 and in the private sector from 1997 to 1998. The medical records submitted accurately set forth Dunaway's medical history as it relates to his claim for benefits.

## STANDARDS

A claimant is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 USC § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her disability. *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995), *cert denied*, 517 US 1122 (1996). The Commissioner bears the burden of developing the record. *DeLorme v. Sullivan*, 924 F2d 841, 849 (9th Cir 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 USC § 405(g); *see also Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*, citing *Magallanes v. Bowen*, 881 F2d 747, 750 (9th Cir 1989). The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F2d 771, 772 (9th Cir 1986). The Commissioner's decision must be upheld,

however, if "the evidence is susceptible to more than one rational interpretation." *Andrews*, 53

F3d at 1039-40.

## DISABILITY ANALYSIS

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is

disabled within the meaning of the Act. 20 CFR § 404.1520. Below is a summary

of the five steps, which also are described in *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir

1999):

Step One: The Commissioner determines whether the claimant is engaged in substantial

gainful activity. If so, the claimant is not disabled. If the claimant is not engaged in substantial

gainful activity, then the Commissioner proceeds to step two. 20 CFR § 404.1520(b).

Step Two: The Commissioner determines whether the claimant has one or more severe

impairments. If not, the claimant is not disabled. If the claimant has a severe impairment, then

the Commissioner proceeds to step three. 20 CFR § 404.1520(c).

Step Three: Because disability cannot be based solely on a severe impairment, the

Commissioner next determines whether the claimant's impairment "meets or equals" one of the

impairments listed in the Social Security Administration ("SSA") regulations, 20 CFR Part 404,

Subpart P, Appendix 1. If so, the claimant is disabled. If the claimant's impairment does not

meet or equal one listed in the regulations, the Commissioner proceeds to step four. 20 CFR

§ 404.1520(d).

Step Four: The Commissioner determines whether the claimant is able to perform work

he or she has done in the past. If so, the claimant is not disabled. If the claimant demonstrates

an ability to perform past work, then the Commissioner proceeds to step five. 20 CFR

§ 404.1520(e).

Step Five: The Commissioner determines whether the claimant is able to do any other

work. If not, the claimant is disabled. If the Commissioner finds the claimant is able to perform

other work, then the Commissioner must show a significant number of such jobs exist in the

national economy. The Commissioner may satisfy this burden through the testimony of a

vocational expert ("VE") or by reference to the Medical-Vocational Guidelines, 20 CFR Part

404, Subpart P, Appendix 2. If the Commissioner demonstrates a significant number of jobs

exist in the national economy that the claimant can perform, then the claimant is not disabled. If

the Commissioner does not meet this burden, then the claimant is disabled. 20 CFR

§ 404.1520(f)(1).

At steps one through four, the burden of proof is on the claimant. *Tackett*, 180 F3d at

1098. At step five, the burden shifts to the Commissioner. *Id.*

**ALJ's DECISION**

At step one, the ALJ found Dunaway had not engaged in substantial gainful activity since

the alleged onset of disability on March 1, 1998.

At step two, the ALJ found Dunaway had the medically determinable severe impairments

of left and right knee degenerative joint disease and cervical strain.

At step three, the ALJ found that Dunaway's impairments did not meet or equal in

severity any impairment listed in the regulations.

At step four, the ALJ determined that Dunaway retained the ability to lift and carry 20

pounds occasionally and 10 pounds frequently, that he needed the opportunity to sit or stand, that

he should have no constant, forceful grip with the right hand, and only occasional overhead reaching. The ALJ found that Dunaway required access to restrooms at normal breaks and should have no concentrated exposure to fumes, gases, or dust. The ALJ concluded that Dunaway was not able to perform his prior relevant work as a welder.

At step five, the ALJ found that Dunaway retained the capacity to perform light and/or sedentary work, including skilled work as a sub assembly of soldering inspector and inside sales at a welding house, as well as unskilled work as a small products assembler and parking lot attendant. As a result, the ALJ found Dunaway not disabled within the meaning of the Act.

## DISCUSSION

Dunaway contends that the ALJ erred by: (1) failing to identify all severe impairments; (2) improperly rejecting the opinions of treating physician Gary I. Rosenthal, M.D.; (3) failing to give proper weight to the disability determination of the Department of Veterans Affairs; (4) finding him not fully credible; and (5) finding lay witnesses not fully credible.

## I. Severe Impairments

### A. Step Two Legal Standards

At step two, the ALJ determines whether the claimant has a medically severe impairment or combination of impairments. *Bowen v. Yuckert,* 482 US 137, 140-41 (1987). The Social Security Regulations and Rulings, as well as case law applying them, discuss the step two severity determination in terms of what is "not severe." According to the regulations, "an impairment is not severe if it does not significantly limit [the claimant's] physical ability to do basic work activities." 20 CFR § 404.1521(a). Basic work activities are "abilities and aptitudes

necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." 20 CFR § 404.1521(b).

The step two inquiry is a *de minimis* screening device to dispose of groundless claims. *Yuckert,* 482 US at 153-54. An impairment or combination of impairments can be found "not severe" only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individuals ability to work." *See* SSR 85-28; *Yuckert v. Bowen,* 841 F2d 303, 306 (9th Cir 1988) (adopting SSR 85-28). Any error by an ALJ in failing to identify an impairment as severe at step two is harmless if the ALJ considers any limitations imposed by the impairment at step four of the analysis. *Lewis v. Astrue,* 498 F3d 909, 910 (9th Cir 2007).

## B. <u>Joint Disease, Tendinitis, and Arthritis in the Hands and Elbow</u>

Dunaway contends that the medical evidence shows severe joint disease, tendinitis, and arthritis in his hands and elbow that result in pain, weakness and a tendency to drop things. He cites an undated radiologic report in which the diagnostic impression is "ulna minus variance, with mild radiocarpal joint degenerative change." Tr. 641.[2] He also points to a January 2001 chart note in which he complains of difficulty holding a coffee cup or anything of significant weight in his right hand. Tr. 652. The diagnostic impression was of "[p]robable pisotriquetral arthritis." *Id.*

The record indicates that Dunaway had multiple complaints of hand, wrist, and elbow pain over a period of several years. A May 8, 1997, x-ray of the right wrist revealed a healed fracture of the distal radius with minimal degenerative joint disease. Tr. 341. On that date, x-rays of the left hand and right elbow were normal. Tr. 340, 398. Five days later, Dunaway was

---

[2] Citations are to the page(s) indicated in the official transcript of the record filed with the Commissioner's Answer.

diagnosed with epicondylitis of the right elbow, and prescribed a splint and ice.  Tr. 330.  In June 1998, Dunaway was seen in the emergency room complaining of right shoulder pain after pitching two games of softball.  Tr. 277.  He was advised to apply ice, heat, and rest.

On November 17, 1999, neurologist Eddie Y. Glantz, M.D., examined Dunaway and concluded that there was "no neurological reason that the patient has any limitation on the ability to sit, stand, walk, lift, carry, handle objects, hear, speak, travel or perform any mental activities."  Tr. 301-05.

In a February 2000 report to the SSA, Dunaway continued to assert that his hands hurt "all the time."  Tr. 158.  A May 2000 x-ray of the right hand was normal, although examination revealed a  palpable chip at MC5 and a prominent MC4 proximal head.  Tr. 525.  By October 2000, Dunaway reported that his right wrist hurt daily, with flare-ups of pain during which he had increased motion loss, weakness, and lack of coordination.  Tr. 461.  These flare-ups were relieved by applying traction to the fourth and fifth digits.  Wayne Kelley, P.A.C., diagnosed a fracture of the base of the fifth right metacarpal, a healed fracture of the right distal radius with radial carpel degenerative disease, early, and epicondylitis of the right elbow, asymptomatic and not expected to flare-up.  Tr. 463.

A January 18, 2001 radiologic report included a comparison to films taken in October 2000.  Tr. 643.  The examiner concluded that there was "very minimal degenerative change in the radiocarpal joint, unchanged from the prior radiograph.  No other significant radiographic abnormalities are identified."  *Id.*

At a follow up examination on March 29, 2001, Dunaway reported that his pain was "still significantly reduced, although it is starting to come back again."  Tr. 654.  The examiner noted

that Dunaway had "absolutely no pain and minimal tenderness with direct palpation manipulation of the pisotriquetral joint. He does have some symptoms of distal radioulnar joint pain with forced supination and forced pronation of the radius about the ulna. Otherwise, his wrist joint motion is normal in flexion-extension, as well as radial and ulnar deviation." *Id.* A bone scan lit up in a focal area on the ulnar aspect of the wrist near the base of the fifth metacarpal. However, x-rays were "not particularly remarkable for any signs of degenerative joint disease, either in the region of the ulnar joint or in the pisotriquetral joint." *Id.* The examiner noted that "[t]he patient has some kind of conflicting findings on the x-rays, physical examination, and with injection. We think we need a little bit more time to decide exactly what is going on." *Id.*

On May 17, 2001, Dunaway's right wrist was placed in a cast for four weeks to allow the tendons and joint to rest. Tr. 658. The cast was removed on June 21, 2001, and the wrist was "not particularly painful." Tr. 663. A removable splint was prescribed, and on July 20, 2001, Dunaway reported that the "splint helped him quite a bit, and he is able to function at a high level with the splint." Tr. 666. By September 20, 2001, Dunaway reported "occasional problems" with pain, but was satisfied. Tr. 702. Physical examination revealed tenderness over the pisiform and triquetrum, with equal range of motion, strength of 5/5 for everything with the exception of a decrease in grip strength. *Id.* He was referred to physical therapy to increase grip strength and range of motion. On November 7, 2001, Dunaway reported to the physical therapist that he had continuous pain in the wrist and that his pain varied between three and eight on a scale of 10, increasing with grasping, gripping, and lifting. Tr. 987. Dunaway told the therapist

that x-rays revealed arthritis in the hand.  His grip strength was less with the right hand than with the left.

In August 2002, Dunaway reported to a therapist that he suffered pain in both wrists that prevented him from lifting 20 pounds with both hands or from holding on to even light things for more than a minute or two.  Tr. 719.  July 2003 x-rays of the right wrist revealed a possible benign cystic change in the capitate without significant degenerative change.  Tr. 832.

An April 2004 examination by Ronald R. Woodruff, P.A.C., co-signed by Paul A. Matson, M.D., concluded:

> Since I have examined him for all of these conditions and re-
> viewed those files, I would say that the veteran has significant
> subjective complaints of joint pain, but has no significant
> objective evidence of degenerative disease on x-ray.  Therefore,
> I would expect the veteran to have minimal issues with an
> occupation, even as a welder he would have suffered from some
> joint pain, and could work in just about any occupation or
> profession at least four to six hours a day.  I would not recom-
> mend that the work be anything with prolonged standing or
> walking.

Tr. 844.

Nerve conduction studies at that time revealed evidence of right median nerve compression.  Tr. 888.  Carpal tunnel syndrome was diagnosed in July 2004, and an endoscopic surgical release was performed in July 2005.  Tr. 878, 980.

The ALJ found that Dunaway retained the ability to lift and/or carry 20 pounds occasionally and 10 pounds frequently and that he was limited to no constant, forceful grip with the right hand and only occasional overhead reaching.  Tr. 785.  The record supports the ALJ's conclusion that Dunaway did not suffer from a medically determinable severe impairment of the hands or elbow as of March 1, 1998, his alleged onset date, through December 31, 2003, his date

last insured, that could not be adequately accommodated by those restrictions. To the extent that

Dunaway's wrist impairment was severe, the ALJ's failure to identify that impairment at step

two was harmless because he adequately accounted for limitations arising from wrist issues in

the residual functional analysis at step four.

### C.  Chronic Headaches

Dunaway argues that the ALJ erred by failing to find his history of syncopes and chronic

headaches a severe impairment because they impair his ability to sustain activity, concentrate,

and drive. As support, he cites a September 17, 2001[3], note on a prescription pad by Gary I.

Rosenthal, M.D., stating that "Dr. Ferguson has diagnosed a complex migraine," and that

"medication can effect [Dunaway's] ability to operate a moving vehicle." Tr. 620-21. The note

further states that Dunaway should not operate a moving vehicle for six months, at which time he

will be re-evaluated. *Id.* Dunaway also cites a June 24, 2001 chart note by Felicia Ferguson,

M.D., noting chronic headaches and an "eight-year history of unusual episodes" which might be

a "seizure disorder," though "as described by patient and wife would be very atypical for

seizures." Tr. 659. Dr. Ferguson recommended an MRI of the brain with an epilepsy protocol

and an electroencephalogram. *Id.* Additionally, Dunaway cites his September 2001 testimony

that he gets shooting pains through the right side of his head which usually stops if he lays down

for an hour. Tr. 33.

The ALJ noted that Dr. Rosenthal's assessment was apparently based on Dunaway's own

reports. Tr. 781. As discussed below, it is unclear on what other information Dr. Rosenthal may

have relied. In addition, the ALJ properly determined that the balance of the evidence revealed a

---

[3] This note is dated the same day as the first hearing before an ALJ.

much less severe condition.  The ALJ cited the July 17, 2001 report of treating neurologist Helmi

Lutsep, M.D., to whom Dunaway reported daily headaches.  Tr. 623.  Dr. Lutsep wrote that

Dunaway reported daily photophobia and nausea, although both were specifically denied at his

June 2001 visit.  *Id.*  Dr. Lutsep prescribed Elavil.  A digital EEG, performed with Dunaway

awake and drowsy, was normal in all respects.  Tr. 629, 635.  The ALJ noted that an August

2001 brain MRI scan was negative.  Tr. 781, 622.  Furthermore, as noted by the ALJ, Dunaway

testified in August 2005 that his driver's license had been re-issued on January 29, 2002, just

three months after Dr. Rosenthal's statements, and that Dunaway testified that his headaches

were well controlled by medication.  Tr. 781, 1021, 1025.

Dunaway has the burden of establishing a physical or mental impairment by medical

evidence consisting of signs, symptoms, and laboratory findings, and not simply on the basis of

his symptoms alone.  20 CFR § 404.1508.  The record supports the ALJ's conclusion that

Dunaway did not suffer from a medically determinable severe impairment of chronic headaches

as of March 1, 1998, his alleged onset date, through December 31, 2003, his date last insured.

**II**.  **Opinion of the Treating Physician**

The ALJ rejected Dr. Rosenthal's January 29, 2001 opinion that Dunaway is limited to

sedentary employment, as well as his September 17, 2001 opinion that Dunaway suffers from a

complex migraine disorder and was on medication that could interfere with his ability to operate

a motor vehicle.

A treating physician's opinion is generally accorded greater weight than an examining

physician's opinion, and an examining physician's opinion is in turn accorded greater weight

than a reviewing physician.  *Edlund v. Massanari*, 253 F3d, 1152, 1157 (9th Cir 2001); *Lester v.*

*Chater*, 81 F3d 821, 830 (9ᵗʰ Cir 1996). The ALJ must give specific, legitimate reasons supported by substantial evidence for rejecting a controverted opinion from a treating physician and "clear and convincing reasons" for rejecting an uncontroverted opinion. *Bayliss v. Barnhart*, 427 F3d 1211, 1216 (9ᵗʰ Cir 2005). This standard applies even "[w]hen a nontreating physician's opinion contradicts that of a treating physician – but is not based on independent clinical findings, or rests on clinical findings also considered by the treating physician." *Morgan v. Comm'r*, 169 F3d 595, 600 (9ᵗʰ Cir 1999), citing *Andrews v. Shalala*, 53 F3d 1035, 1041 (9ᵗʰ Cir 1995). The opinion of a nonexamining medical advisor does not constitute substantial evidence justifying rejection of a treating or examining physician's opinion unless it is "supported by other evidence in the record and . . . consistent with it." *Id*. The opinion of the treating physician is not necessarily conclusive to the ultimate issue of disability, which is reserved for the Commissioner. SSR 96-5p, 1996 WL 374183 *2; *see also Morgan*, 169 F3d at 601.

As discussed above, the ALJ properly rejected Dr. Rosenthal's September 17, 2001 opinion based on other medical evidence and Dunaway's own testimony. Dr. Rosenthal's earlier opinion of January 29, 2001, is hand-written on a blank form entitled "Chronological Record of Medical Care" and addressed to Washington Mutual. It states as follows:

> William Dunaway is under my care. His combination of medical conditions have limited his ability for gainful employment. He suffers from syncopal episodes (passes out) [which] prevents him from driving. His severe bilateral chondromalacia (knees) and degenerative neck problems dictate a sedentary employment (he is enrolled in vocational rehabilitation). Please use this medical information appropriately. The family is experiencing financial difficulty.

Tr. 617.

The ALJ gave Dr. Rosenthal's opinion "little weight" as it was not supported "by way of test results, objective findings, or other supporting information." Tr. 781.

13  - FINDINGS AND RECOMMENDATION

Dunaway argues that the ALJ's rationale is true only if Dr. Rosenthal's opinion is read in isolation from the other VA records. Because Dr. Rosenthal is a VA neurologist and the VA record-keeping system was electronic, Dunaway believes that it is logical to impute that Dr. Rosenthal read and relied on the entire VA record. Both Dunaway and the ALJ describe Dr. Rosenthal as a VA treating physician, but an exhaustive review of the entire 1,075 page record does not reveal any indication that he ever actually treated or even examined Dunaway. His name does not even appear in the VA records.[4] Thus, this court declines to assume that Dr. Rosenthal reviewed the entire VA record.

Even assuming, without deciding, that Dr. Rosenthal was Dunaway's treating physician, his opinion as to employability is not a medical opinion and is contradicted by substantial evidence in the record.

In March and June 1999, Dunaway was examined by Robin M. Sarner, M.D., for bronchitis and chronic right upper quadrant pain. Tr. 202. On September 20, 1999, Dr. Sarner stated: "I know of no physical or mental limitations that he would have that would limit his ability to sit, stand, walk, lift, carry, handle objects, hear, speak, travel and perform mental activities." *Id.*

On September 13, 1999, Dunaway was examined by Douglas C. Walta, M.D., for complaints of a 17-18 year history of lower abdominal cramping, and chronic right upper quadrant pain. Tr. 197-98. Dunaway reported chronic daily constipation, diarrhea, and nausea. Dr. Walta's diagnostic impression was "1. [d]iffuse ill-defined abdominal pain of unknown

_____

[4] In fact, there is no evidence, other than the stamp under the signature, that Gary I. Rosenthal even is a physician.

etiology, 17-18 years duration without weight loss.  2.  Probably functional bowel disease."

Tr. 198.  Dr. Walta concluded:

> I suspect there is a huge secondary gain here that may be very hard
> to separate.  He's 10-20% service-connected for this process.   If
> we can't find anything, he may potentially lose it, or if his symptoms
> go away he may lose it.  On the other hand, if we can find an expla-
> nation, the amount goes up.  It means it's going to be hard to remove
> his symptoms.

*Id.*

In November 1999, as noted above, Dr. Glantz found no neurological reason for a

limitation in Dunaway's ability to sit, stand, walk, lift, carry, handle objects, hear, speak, travel

or perform mental activities.  Tr. 301.

On July 1, 2003, Dunaway was examined by Allen Doyle, M.D., whose opinion was

endorsed by Paul Matson, M.D.  Tr. 852-54.   Dr. Doyle reviewed Dunaway's medical records.

and diagnosed irritable bowel syndrome, stating that this "is not a condition which makes him

unemployable."  Tr. 853.  Dr. Doyle also diagnosed gastroesophageal reflux disease, which "at

this point is not a condition which does make him unemployable," and chronic obstructive

pulmonary disease, which "is adequately controlled with the inhalers when he does need to and

does not make him unemployable at this time."  Tr. 854.

Finally, as discussed below, no cause could be found for the syncopal episodes reported

by Dunaway which appear to have resolved by July 2001.  Tr. 623-24.

Given that Dr. Rosenthal's January 29, 2001 opinion is contradicted by other examining

physicians, the ALJ had to present specific and legitimate reasons for rejecting it.  The ALJ did

so by finding that it was not supported by test results, objective findings, or other supporting

information.

## III. Determination of the Veterans Administration

In a Rating Decision dated May 4, 2004, the VA determined that Dunaway was entitled to individual unemployability benefits effective February 18, 2003, based on the VA examination conducted on April 12, 2004, and review of the claims file. Tr. 1008-10. An ALJ "must ordinarily give great weight to a VA determination of disability." *McCartey v. Massanari,* 298 F3d 1072, 1076 (9th Cir 2002). An ALJ "may give less weight to a VA disability rating if he gives persuasive, specific, valid reasons for doing so that are supported by the record." *Id.*

The ALJ considered the VA assessment but declined to give it controlling weight. First, he explained:

> The rationale used by the VA . . . is based on an examiner indicating he could only work 4-6 hours a day.. While they find his unemployability started "2/18/03," the only "evidence" they cite is an exam conducted on 4/12/04. That exam . . .is the only evidence in the record citing the ability to work 4-6 hours a day. The quote used by the VA is taken out of context and clearly did not convey a limitation on ability to work. First, the evaluator says he knows the veteran and finds him to have "significant subjective complaints" of joint pain but has "no significant objective evidence" or x-rays. Second, the evaluator says he is commenting on his employability and notes he would "have minimal issues" with any occupation and could work even as a welder "at least 4-6 hours a day." The VA appears to have misinterpreted the evaluators assessment that he could work "at least 4-6 hours a day," and, come to the erroneous conclusion he was "only able to work 4-6 hours a day." Thus, not only did the VA have no support for the date of 2/18/03, but they manipulated the evidence to reach the conclusion of unemployability.

Tr. 782 (citations omitted; emphasis in original).

Although Dunaway contends that the VA determination was necessarily based on the all of the VA medical records, it only cites to the April 12, 2004 examination (Tr. 844) and, as accurately explained by the ALJ, misreads the comments by the examiner.

Second, the ALJ assessed each element of the VA's disability determination by impairment, accurately noting the contrary objective medical evidence. Tr. 772-73. Third, the ALJ noted that the "statutory and regulatory rules of SSA involve a consideration of vocational factors different than the VA," and correctly noted that under age 50, Dunaway would be able to perform sedentary work and, therefore, would not be considered disabled under the SSA regulations. Tr. 782.

Thus, the ALJ properly identified specific, persuasive and valid reasons fully supported by the record to minimal weight to the VA's disability determination.

## IV.  Dunaway's Credibility

The ALJ found Dunaway's "statements and testimony lacking credibility and not fully supported by the medical evidence of record." Tr. 778. Dunaway contests this finding.

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities. *Andrews,* 53 F3d at 1039. However, the ALJ's findings must be supported by specific, cogent reasons. *Reddick v. Chater,* 157 F3d 715, 722 (9th Cir 1998). Absent affirmative evidence showing that the claimant is malingering, the ALJ must give "clear and convincing" reasons for rejecting the claimant's testimony. *Id.* The ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. *Id.* The evidence upon which the ALJ relies must be substantial. *Id* at 724; *see also Holohan v. Massanari,* 246 F3d 1195, 1208 (9th Cir 2001). In addition, the findings must be sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony. *Thomas v. Barnhart,* 278 F3d 947, 958 (9th Cir 2002).

To support his credibility determination, the ALJ first found that Dunaway's "testimony, especially as to his activities and limitations, keeps shifting," and gave two examples. Tr. 777. As one example, he cited physical therapy chart notes indicating Dunaway could walk a mile (Tr. 1007), when Dunaway had previously stated he could walk only 100 feet at a time. However, the note in question dated September 30, 2004, reveals that Dunaway regained the ability to walk a mile only after receiving physical therapy. *Id.* Dunaway had aggravated his back in August 2004 when he tried to pick up his 20 pound granddaughter and sought physical therapy on September 14, 2004. Tr. 1000. After two weeks of physical therapy, he had no low back pain and was back to walking a mile. Tr. 1007. It is not clear when he said that he could only walk 100 feet as noted by the ALJ. At the first hearing in September 2001, he said he could only walk two or three blocks. Tr. 35. But by the second hearing four years later in August 2005, he said he walked for exercise pursuant to doctor's orders, could probably walk at least a half mile and had stopped walking a mile the previous summer (Tr. 1060, 1062-63) which coincides with the incident with his granddaughter.

As a second example, the ALJ said the "record also contains evidence of him playing softball and pitching." Tr. 777. The ALJ failed to add that Dunaway stopped pitching four or five years ago and was only the extra hitter once a week over a three month season in 2002. Tr. 1058-62.

Although these examples are not persuasive reasons for characterizing Dunaway's testimony as "shifting," the ALJ cites these same examples to also conclude that Dunaway's "allegations as to the intensity, persistence and limiting effects of these symptoms are disproportionate and not supported by the objective medical findings." Tr. 777. There is

objective medical evidence of conditions that could be causing Dunaway pain, but, as the ALJ properly noted, the "objective findings have been relatively minimal." *Id.* May 1997 x-rays of both knees were normal. Tr. 342. July and September 2001 knee x-rays revealed "minimal" and "slight" degenerative changes. Tr. 666, 703. In September 2001, Dunaway reported that the pain is his left knee was significantly better and that he had no complaints regarding his right knee. Tr. 703. July 2003 x-rays found no significant degenerative changes when compared to prior films. Tr. 833. The ALJ also properly noted that cervical spine x-rays were "normal" in 2001 and "normal" and "unchanged" in 2004. Tr. 690, 777, 843.

In addition, the ALJ concluded that Dunaway's "activities of daily living are extensive and appear inconsistent with allegations of debilitating condition." Tr. 777-78. Dunaway takes issue with this conclusion because the ALJ failed to take into account how Dunaway feeds his animals, mows the lawn with a riding mower, and takes classes. The feeding of his animals takes only 30 minutes a day with only light lifting, and he fishes from the riverbank in a chair. Tr. 1035, 1037.

Regardless of how Dunaway performs some of his daily activities, the ALJ was primarily relying on the number and variety of Dunaway's activities. The ALJ may cite a claimant's activities of daily living in finding a claimant not credible. *Smolen v. Chater*, 80 F3d 1273, 1284 (9th Cir 1996). These activities are not necessarily transferable to the workplace, but may suggest the claimant can do more than he alleges. The ALJ noted that after being laid off for business reasons "not related to the allegedly disabling impairments" (*see* Tr. 850), Dunaway "has been a 'house-husband,' and spends his days at home, gardening, doing household chores, including cooking, mowing the lawn on a riding lawn mower, and cleaning." Tr. 777-78. He

also noted Dunaway's report in July 2003 that he "was able to work for about 1 ½ hours before resting," spent time with his animals, "has intermittently been involved in vocational rehabilitation," and "was 'engrossed' in spending time on his school work." Tr. 778. How Dunaway performs certain activities does not detract from the overall picture painted by his daily activities. "Although the evidence of [a claimant's] daily activities may also admit of an interpretation more favorable to [claimant], the ALJ's interpretation was rational, and '[w]e must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation.'" *Burch v. Barnhart*, 400 F3d 676, 680-81 (9th Cir 2005), citing *Magallanes*, 881 F2d at 750. Here the evidence of daily activities is rationally susceptible to the ALJ's interpretation.

The ALJ also found that "[i]ssues of secondary gain also erode the claimant's credibility as his 'seizure' disorder had no medical cause and spontaneously developed while the claimant was pending both social security disability benefits and an increase in his VA disability benefits," and that "his seizures have subsequently spontaneously ceased." Tr. 778. Contrary to Dunaway's argument, the ALJ did not conclude that Dunaway had a "seizure disorder" rather than vasovagal syncope. The ALJ acknowledged uncertainty as to a diagnosis by putting quote marks around the word "seizure." If a desire or expectation of obtaining benefits were sufficient to discredit a claimant, no claimant would be found credible. *Ratto v. Sec'y, Dep't of Health and Human Servs.*, 839 F Supp 1415, 1428-29 (D Or 1993). However, the ALJ did not rely solely on Dunaway's applications for disability insurance as evidence of secondary gain. Instead, he cited undisputed evidence as to timing of a particular symptom that supports his finding.

Finally, and most importantly, as ordered by the Appeals Council, the ALJ reevaluated Dunaway's testimony that he needs to lie down for several hours each day to relieve pain. Doing so, he found that Dunaway gave "contradictory testimony and statements regarding his need to rest and his physical abilities in general." Tr. 778. Among other citations to the record, the ALJ cited the June 10, 2003 psychological evaluation in which Dunaway "estimated that he had good days about 70% of the time," and on those days, "could 'run a marathon,' with plenty of energy, his house was 'spotless, and he could 'do what I want to do, how I want, when I want.'" Tr. 778, 921. He "reported doing yard work, socializing, and fishing." *Id.* Dunaway also reported napping most days and daily drinking a liter of Pepsi, a gallon of iced tea, and at least two gallons of water through the day and evening. Tr. 778, 922. As noted by the ALJ, Dunaway was advised to "decrease his caffeine intake, decrease evening fluids, employ the regular use of bedtime analgesic, and possibly discontinue his napping." Tr. 779, 925. The records indicate that Dunaway never reported a need to rest during the day to any of his doctors.

In sum, the ALJ articulated clear and convincing reasons based upon substantial evidence to find that Dunaway's "allegations concerning his inability to work to be sufficiently credible to serve as additional evidence to support a finding of disability." Tr. 779.

## V. Lay Witness Testimony

Finally, Dunaway contends that the ALJ erred by rejecting the lay witness testimony by Debra Dunaway (Dunaway's wife), David Morris, Elizabeth Elithorpe, and vocational counselor Bernie Gilder.

Friends and family members and others in a position to observe a claimant's symptoms and daily activities are competent to testify as to the claimant's condition. *Dodrill v. Shalala,* 12

F3d 915, 918 (9th Cir 1993). Such testimony cannot be disregarded without comment. *Nguyen v. Chater*, 100 F3d 1462, 1467 (9th Cir 1996). In order to properly discount lay witness testimony, the ALJ must give reasons that are germane to the witness. *Id*, citing *Dodrill*, 12 F3d at 919.

Debra Dunaway testified that her husband had numerous limitations because of constant pain. Tr. 51. She testified that he was unable to carry anything of any weight, stumbled easily, and sometimes slept all day. Tr. 53. Mrs. Dunaway testified that her husband had trouble sitting long enough to drive to town and had little endurance. Tr. 54. She stated that her husband was irritable, had a poor appetite and was unable to tolerate many foods. Tr. 52.

The ALJ found Mrs. Dunaway "not fully credible on the issue of disability." Tr. 779. He stated that "[w]hile the claimant's activities, according to his wife, may be limited, her testimony did not support a finding that he is precluded from all work activity." Tr. 780. Dunaway complains that the issue is not whether he is precluded from all work activity, but whether he can sustain full-time employment. Dunaway reads too much into the ALJ's wording. As the ALJ also stated, and properly so, "[t]here is more reliable evidence of record from examining medical professionals who are trained to evaluate impairments and their impact on functional capacity." Tr. 780. He also correctly noted that Mrs. Dunaway's testimony that Dunaway was sometimes not able to mow the lawn (Tr. 53) was contradicted by Dunaway himself. Tr. 124, 780. The ALJ also referred to "the drama attending her testimony" as "call[ing] into question issues of secondary gain." Tr. 780. Any such dramatic testimony cannot be evaluated on a paper record and may well support the ALJ's conclusion.

David Morris, Dunaway's long time friend, testified that he witnessed an event at which it appeared that Dunaway was having a heart attack. Tr. 175. In May 2001, Elizabeth Ellithorpe, a private nurse, asserted that she has seen Dunaway have several "attacks" that leave him dazed, confused, and unable to answer simple questions for several hours. Tr. 174. Ms. Ellithorpe opines that these attacks seem to come on with extreme stress or excitement. *Id.* Dunaway's son, Keith Dunaway, similarly reported in May 2001 seeing his father have "strange attacks" during which he appeared to be dazed and confused. Tr. 170. He stated that his father "got excited and passed out" when trying to break up a fight between his sons. *Id.* Bernie Gildner, a vocational counselor, was hired to train Dunaway to repair computers from September 1998 to July 1999. Tr. 45. The training lasted six hours a day, four to five days a week. Tr. 46. In July 1999, Dunaway reported to the emergency room complaining of chest pain. Tr. 231-39. There was no evidence of myocardial infarction, and chest x-rays were normal. Tr. 227. Thereafter, Dunaway was unable to get on his hands and knees to work on computers without lightheadedness and abdominal pain. Tr. 46. Gildner testified that Dunaway appeared to be unable to remember how to do simple repair processes and the training had to be ended based on these health problems. Tr. 46-47.

The ALJ found all of the above witness statements credible. Tr. 780. To the extent that Dunaway argues that the ALJ failed to give these witness statements sufficient weight, the ALJ properly found that the described symptoms seem to have resolved by July 2001, according to his neurologist. Tr. 623-24. In January 2003 Dunaway reported that he had had "a mild seizure" the previous night, but now felt good and wanted his drivers license back. Tr. 940. In February 2003, Dunaway reported his last "seizure," during which he had the onset of an intense pain in

the neck, but did not lose consciousness.  Tr. 937.  He was seen in the emergency room and was told it was a seizure.  *Id*.  Dr. Ferguson noted in follow-up that Dunaway's medication would cause emergency room personnel to assume seizure disorder, when her diagnostic impression was of a migraine variant or muscle spasm.  Tr. 938.

The ALJ properly considered the lay witness testimony.  To the extent that the ALJ rejected lay witness conclusions regarding the ability of Dunaway to maintain employment, his determination is supported by substantial evidence.

## RECOMMENDATION

For the reasons set forth above, the Commissioner's decision should be affirmed.

## SCHEDULING ORDER

Objections to these Findings and Recommendations, if any, are due November 26, 2007.  If no objections are filed, then the Findings and Recommendations will be referred to a district judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendations will be referred to a district judge and go under advisement.

Dated this 5th day of November, 2007.

/s/  Janice M. Stewart_____
JANICE M. STEWART
United States Magistrate Judge